UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REGINALD PEARSON,                                :

                Petitioner,                 :        12 Civ. 3386 (AJN) (AJP)

          -against-                         :        **REPORT AND RECOMMENDATION**

THOMAS LAVALLEY,                                :

                Respondent.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Alison J. Nathan, United States District Judge:**

          Pro se petitioner Reginald Pearson seeks a writ of habeas corpus from his May 28, 2008 conviction, after a jury trial in Supreme Court, New York County, of eight counts of predatory sexual assault, one count of second degree kidnapping, four counts of first degree rape, two counts of first degree criminal sexual act, and one count of fifth degree criminal possession of stolen property, and his sentence to an aggregate prison term of 175 years to life.  (Dkt. No. 1: Pet. ¶¶ 1-5.)

          Pearson's habeas petition asserts that:  (1) Pearson's warrantless arrest in his home violated Payton v. New York, 445 U.S. 573, 100 S. Ct. 1371 (1980), and statements and physical evidence obtained during the arrest should have been suppressed (Pet. ¶ 13(1)); (2) the trial court improperly admitted hearsay testimony in violation of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004) (Pet. ¶ 13(2)); and (3) denial of Pearson's post-conviction motion seeking discovery of electronic DNA data violated his due process rights (Pet. ¶ 13(3)).

          For the reasons set forth below, Pearson's habeas corpus petition should be DENIED.

## FACTS

On December 30, 2006 at approximately 4:00 a.m. Pearson and Joell Johnson choked and punched DC in the elevator of her apartment building until she lost consciousness.  (Dkt. No. 14-1: State Br. at 2, 15; Dkt. No. 14: Maerov Aff. Ex. H: Pearson 1st Dep't Br. at 5, 21-22.)[1/]  DC regained consciousness in Johnson's uncle's apartment, upstairs from DC's apartment.  (State Br. at 15, 17, 20; Pearson 1st Dep't Br. at 22-23, 25-26.)  Pearson and Johnson raped DC multiple times before they released her at approximately 9:00 a.m.  (State Br. at 15-18; Pearson 1st Dep't Br. at 22-23.)  Pearson was arrested later that evening at approximately 7:45 p.m. in the hallway outside of his and his sister's apartment.  (State Br. at 20-21; Pearson 1st Dep't Br. at 25.)

DNA testing of DC's rape kit revealed two individuals' DNA profiles, one a complete match to Johnson, the other a partial match to Pearson.  (State Br. at 22-23; Pearson 1st Dep't Br. at 26-28.)  DC's bra and underwear were recovered from Johnson's uncle's apartment, and DC's keys and jewelry were recovered from Pearson at the time of his arrest.  (State Br. at 20-21; Pearson 1st Dep't Br. at 26.)  DC identified Pearson as one of her assailants from a photo array on December 30, 2006, and a lineup at the Special Victims Squad on December 31, 2006.  (State Br. at 5, 10, 22; Pearson 1st Dep't Br. at 24.)

On January 29, 2007, a grand jury indicted Pearson and Johnson for twelve counts of predatory sexual assault, one count of second degree kidnapping, four counts of first degree rape,

---

[1/]      To protect the victim's privacy, she will be referred to by her initials instead of her name.  (See Dkt. No. 10: 6/29/12 Order.)

two counts of first degree criminal sexual act, one court of first degree assault, two counts of second degree assault, and one count of fifth degree possession of stolen property.  (State Br. at 3.)[2/]

**The Pre-Trial Suppression Hearing**

Prior to trial, Pearson moved to suppress the physical evidence recovered from his person and the statements he made about that evidence at the time of his arrest.  (Dkt. No. 14-1: State Br. at 4; Dkt. No. 14: Maerov Aff. Ex. H: Pearson 1st Dep't Br. at 8 n.2.)  Justice Charles Tejada held a suppression hearing in January 2008.  (Dkt. No. 16: Suppression Hearing Transcript ("H.") 1, 301.)[3/]

**The Prosecution's Case**

Detective Richard Ruiz of the Manhattan Special Victims Squad began to investigate DC's rape on December 30, 2006.  (Dkt. No. 16: Ruiz: H. 52, 93.)  Det. Ruiz obtained descriptions from DC of her assailants while she was in the hospital, and also obtained the names and descriptions of Pearson and Johnson from Johnson's uncle, who resided in the apartment where the rape occurred.  (Ruiz: H. 53-57, 95-96, 111.)  Johnson's grandmother identified a photograph of Pearson, and DC identified Pearson and Johnson from a photo array.  (Ruiz: H. 57-63, 103, 114-16.)

---

[2/]      On November 15, 2007, Johnson pleaded guilty to first degree rape and second degree kidnapping, and on January 20, 2008 was sentenced to 20 years imprisonment.  (State Br. at 2 n.2; Pearson 1st Dep't Br. at 5 n.1.)

[3/]      Pearson's pre-trial motion also sought to suppress his custodial statements to the police and certain identification evidence.  (State Br. at 4; Pearson 1st Dep't Br. at 8 n.2; H. 259, 302-03.)  Because Pearson's custodial statements and the identification evidence are no longer at issue (see Pearson 1st Dep't Br. at 8 n.2), the Court limits the summary of the suppression hearing to those portions that are relevant to the physical evidence and statements obtained at the time of Pearson's arrest.

Ruiz ran a search of Pearson's criminal history, which yielded a possible home address at 51 Irving Place in Brooklyn.  (Ruiz: H. 58, 63, 104-05.)

Detectives Noel Torres and Joseph Sallustio of the Brooklyn Special Victims Squad joined the investigation.  (Torres: H. 8-9; Sallustio: H. 229.)  Det. Torres searched Pearson's criminal history, which revealed multiple weapons charges.  (Torres: H. 11, 44-45.)  Det. Torres made this information known to all members of the investigation team for their safety, because it suggested that Pearson could be armed and dangerous when encountered.  (Torres: H. 11, 44-45.)

Det. Torres, Det. Sallustio, and two other detectives arrived at 51 Irving Place at approximately 7:00 p.m. on December 30, 2006.  (Torres: H. 11-12, 22-24, 34; Sallustio: H. 229-30, 246.)  Pearson's sister Roslyn answered the door when the detectives knocked.  (Torres: H. 11-13, 24; Sallustio: H. 230-32.)  Dets. Torres and Sallustio identified themselves as police officers or "detectives from parole" and asked whether Pearson was home, and Roslyn replied that he was not.  (Torres: H. 12-13, 24; Sallustio: H. 230-32, 244-46.)  The detectives asked if they could come in and speak with her, and Roslyn said "yes" and told them to "come in."  (Torres: H. 12, 24-26; Sallustio: H. 231-32, 247-48.)

Once inside, Roslyn asked Dets. Torres and Sallustio what was going on.  (Torres: H. 12, 26.)  The detectives did not want Roslyn to alert Pearson that they were from the Special Victims Squad, so they told her they were from the parole division and were there to verify Pearson's address for an issue with his parole status.  (Torres: H. 12-13; Sallustio: H. 230-33, 244-46.)  Roslyn offered to call Pearson, and agreed not to tell him that the detectives were there.  (Torres: H. 13-14; Sallustio: H. 232-33, 236, 244-46.)  Roslyn called Pearson, and informed the detectives that Pearson was bringing her food and would be home shortly.  (Torres: H. 13-14; Sallustio: H. 233, 236.)

While the other two detectives waited outside the building, Dets. Torres and Sallustio waited in the apartment for approximately forty-five minutes, during which time they had a cordial conversation with Roslyn. (Torres: H. 14-15, 28-29, 33-34; Sallustio: H. 233, 248-49.) Roslyn never asked the detectives to leave. (Torres: H. 14.)

At approximately 7:45 p.m., the detectives waiting outside called and told Det. Sallustio that Pearson had entered the building. (Torres: H. 14-15, 29; Sallustio: H. 234-35.) As Det. Torres walked toward the door, it opened suddenly, catching him off guard. (Torres: H. 15, 29; Sallustio: H. 235.) Pearson was still in the doorway when Det. Torres grabbed Pearson's hands and identified himself as a police officer. (Torres: H. 15-16, 29-31; Sallustio: H. 235, 253.) Det. Torres led Pearson into the hallway where they explained that he would need to accompany them to straighten out a parole status issue, and that he would need to be handcuffed "for everybody's safety." (Torres: H. 15-17, 32, 34-35; Sallustio: H. 234-36, 253.)

Once handcuffed, Det. Torres searched Pearson for safety reasons and recovered a set of keys and some jewelry from Pearson's jacket pocket. (Torres: H. 17-18, 20, 36-38; Sallustio: H. 236.) Without prompting, Pearson insisted they give the keys to Roslyn because she needed them to get into the apartment, and volunteered that the jewelry belonged to his girlfriend. (Torres: H. 18-19, 38-40; Sallustio: H. 236.) Det. Torres went back into the apartment to speak with Roslyn, who denied that the keys belonged to her. (Torres: H. 18, 40.)

**Pearson's Case**

Roslyn offered similar testimony to that of Dets. Torres and Sallustio (see Dkt. No. 16: H. 315), but her testimony differed in two material respects:

First, Roslyn testified that when she told the detectives that Pearson was not home, one of them tried to see past Roslyn, causing her to step back into the apartment, and the detectives just entered without asking.  (Roslyn: H. 168-70.)  Roslyn's testimony went on to corroborate the detectives' testimony, including that they had a polite conversation for approximately forty-five minutes while waiting for Pearson, and that Roslyn never asked them to leave.  (Roslyn: H. 172-73, 205.)

Second, Roslyn testified that when Pearson returned, he entered the apartment, walked eight feet into the kitchen where Roslyn and the detectives were, and asked why the detective was there.  (Roslyn: H. 175-77, 208.)  Roslyn's testimony about the arrest otherwise corroborates the detectives' testimony, including that they searched Pearson in the hallway, and that Roslyn told the detectives that the keys recovered from Pearson's pocket did not belong to her. (Roslyn: H. 177-80, 209-10.)

**Justice Tejada's Decision**

Justice Tejada denied Pearson's suppression motion.  (Dkt. No. 16: H. 301-22.) Based on the totality of credible evidence, Justice Tejada concluded that the detectives entered and remained in Pearson's apartment with Roslyn's permission and consent.  (H. 305.)  Justice Tejada credited the detectives' testimony and found that Pearson was stopped at the threshold of the apartment.  (H. 306, 314-15.) Justice Tejada discredited Roslyn's testimony that Pearson was inside the apartment at the time of his arrest, finding that "it is not credible that [Pearson] would be allowed to go past the threshold of the apartment or have a discussion with his sister" given the information the detectives had about Pearson, including "the possibility that he was armed and his record for violence." (H. 315.)  Justice Tejada made the following legal findings:

Based on the foregoing, the defendant's motion to suppress the seizure of physical evidence, the jewelry and keys, the statements and identification in evidence is denied.

Specifically, the police had probable cause to arrest the defendant based on their investigation, including information from various witnesses, including the complaining witness' identification of the defendant through a constitutionally permissible photo array.

The arrest of the defendant on the threshold of his apartment was not a violation of the <u>Payton</u> ruling in this case . . . .

First of all, with respect to the defendant, the defendant was not in the apartment . . . .

      . . . .

With respect to the seizure of the keys and jewelry, it was incident to a lawful arrest.  The police had probable cause to arrest the defendant, and there was no violation with respect to the search incident to a lawful arrest.

Lastly, with respect to this defendant's statement, first, the statements occurred right after the defendant was arrested in the hallway of the apartment building, it was spontaneous.

Consequently, the ruse is not constitutionally impermissible, even though <u>Miranda</u> warnings had not been given at that time. . . .

      . . . .

Based on the foregoing, the motion is denied in all respects.

(H. 318-21; <u>see also</u> H. 306-07.)

## **The Trial**

On the evening of December 29, 2006, DC attended a party with friends, returning to her apartment building at approximately 4:15 a.m on December 30.  (Dkt. No. 14-1: State Br. at 14; Dkt. No. 14: Maerov Aff. Ex. H: Pearson 1st Dep't Br. at 21-22.)  Pearson and Johnson got on the elevator with DC.  (State Br. at 14; Pearson 1st Dep't Br. at 22.)  The elevator lighting was

"pretty good," and DC described Pearson as taller and darker skinned than Johnson.  (State Br. at 14-15.)  After the only other passenger got off on the twelfth floor, Pearson wrapped his arm around DC's neck, Johnson punched her in the face, and DC lost consciousness.  (State Br. at 15; Pearson 1st Dep't Br. at 22.)

DC awoke in a "dim[ly]" lit bedroom with two beds.  (State Br. at 15; Pearson 1st Dep't Br. at 22.)  DC began "fighting" and "swinging" when Pearson and Johnson tried to remove her pants, so Pearson got on top of her and choked her until she lost consciousness again.  (State Br. at 15; Pearson 1st Dep't Br. at 22.)  When DC awoke the second time, Pearson and Johnson proceeded to rape her multiple times.  (State Br. at 15-17; Pearson 1st Dep't Br. at 22-23.)  When DC was allowed to use the bathroom, she saw an elderly man with a walker in another bedroom across the hall from the bathroom.  (State Br. at 15-16.)

When Pearson and Johnson eventually let DC leave the apartment, she ran down the stairs to her fourteenth floor apartment, banged on her apartment door, and her child's babysitter, Ashley Watson, answered.  (State Br. at 17-18; Pearson 1st Dep't Br. at 23.)  Watson called 911 to report the incident.  (State Br. at 18; Pearson 1st Dep't Br. at 23.)  DC described her assailants as men she recognized from "around" the building and that one was taller than the other.  (State Br. at 18-19.)  In the ambulance, DC again described one assailant as taller and darker skinned than the other.  (State Br. at 19.)  At the hospital, a Sexual Assault Forensic Examiner took multiple "swabs" from DC to prepare a sexual assault kit.  (State Br. at 19; Pearson 1st Dep't Br. at 26-27.)

At approximately 1:10 p.m. on December 30, 2006, Det. Ruiz spoke to Johnson's uncle, Kenneth Johnson, who lived in Apartment 19E, where the crime occurred.  (State Br. at 20; Pearson 1st Dep't Br. at 25-26.)  Thereafter, Det. Ruiz began looking for Pearson and Johnson.

(State Br. at 20; Pearson 1st Dep't Br. at 25-26.)[4]  Det. Ruiz also spoke with DC while she was in

---

[4]      Det. Ruiz testified as follows:

> Q.      Now, early on in your investigation, did you also interview a person named
> Kenneth Johnson?
>
> A.      Yes.
>
> Q.      Who is Kenneth Johnson?
>
> A.      The uncle of the second perpetrator, Joel Johnson.
>
> Q.      Where does Kenneth Johnson live?
>
> A.      Inside the apartment where the crime occurred, at 545 West 126th Street,
> inside Apartment 19E.
>
> Q.      Did you learn from [Kenneth] Johnson the names of some of Joel Johnson's
> friends --

[Defense Counsel]:  Objection.  Hearsay.

THE COURT:  Sustained.

> Q.      As a result of your conversations with Kenneth Johnson, did you develop
> other suspects in this case?

[Defense Counsel]:  Objection as to the term "suspects," and also hearsay.

[Prosecutor]:  May we approach, Your Honor?

THE COURT:  Yes.  Come up.

            (A discussion was held off the record.)

THE COURT:  Please proceed.

> Q.      Without telling us anything that [Kenneth] Johnson said, what did you do as
> a result of your interview with him?

                                                            (continued...)

the hospital, and she repeated her description of Pearson as being darker skinned and taller than Johnson. (State Br. at 20.) Two detectives searched Kenneth Johnson's apartment pursuant to a search warrant at approximately 5:40 p.m. on December 30, 2006, and recovered torn underwear from a bedroom, which DC identified at trial as hers. (State Br. at 20.)

At approximately 7:00 p.m. that evening, Det. Torres and three other detectives went to 51 Irving Place in Brooklyn, but Pearson was not home. (State Br. at 20.) Det. Torres spoke with Pearson's sister Roslyn, and waited with her in the apartment until Pearson arrived approximately forty-five minutes later. (State Br. at 20-21.) When Pearson arrived, he was arrested and searched in the hallway outside the apartment. (State Br. at 21.) The detectives recovered keys and some jewelry from Pearson's jacket pockets. (State Br. at 21.) Pearson told Det. Torres that the keys were Roslyn's and the jewelry was his girlfriend's. (State Br. at 21.) Det. Torres went back into the

---

[4]/      (...continued)
              . . . .

          A.      We proceeded to search for two individuals that were identified by him, one
                  being his --

          [Defense Counsel]:  Objection.  Move to strike.

          THE COURT:  Granted.  Don't tell us anything.  Just tell us what you did.  You
          looked for two individuals.

          Q.      What were the names of the individuals?

          A.      Reginald Pearson and Joel Johnson.

          Q.      Did you ultimately arrest a person named Reginald Pearson?

          A.      Yes.

(Dkt. No. 16: Ruiz: Trial Transcript ("Tr.") 273-74.)

apartment and "found out that the keys did not belong to" Roslyn.  (State Br. at 21; Pearson 1st Dep't

Br. at 25.)[5/]  At trial, DC identified the keys as hers (DC: Tr. 190-91), and both DC and her child's

babysitter Watson identified the jewelry as DC's.  (State Br. at 21; Pearson 1st Dep't Br. at 24-25.)

        Johnson was arrested on December 31, 2006, and DC identified Pearson and Johnson

during two separate lineups that evening.  (State Br. at 22.)  Detectives took "swabs" from Johnson

and Pearson while in custody.  (State Br. at 22; Pearson 1st Dep't Br. at 27.)

        Criminalist Irene Wong of the Office of the Chief Medical Examiner ("OCME")

testified as to the OCME's analysis of the swabs taken from Pearson and Johnson as well as the

sexual assault kit containing DC's swabs.  (State Br. at 22; Pearson 1st Dep't Br. at 27.)[6/]  A complete

DNA profile typically consists of twenty-six paired "alleles."  (State Br. at 22.)  OCME developed

complete DNA profiles for Pearson and Johnson from their swabs.  (State Br. at 22.)

---

[5/]     Det. Torres testified as follows:

     Q.     What did you do once you had the keys and the jewelry?

     A.     Well, I went back in the apartment to confer with [Pearson's] sister about the keys.  I recall seeing a set of keys on the table in the apartment on the coffee table.  I found out that the keys did not belong to her --

     [Defense Counsel]:  Objection.  Hearsay.

     THE COURT:  Overruled.

     A.     I found out that the keys did not belong to her and when I took a closer look at the keys, I saw that there was blood all over them.

     (Torres: Tr. 536-37.)

[6/]     Certified copies of three OCME files also were admitted into evidence.  (Wong: Tr. 451.)

OCME extracted DNA from two swabs taken from two different parts of DC's body during the preparation of the sexual assault kit.  (State Br. at 22-23; Pearson 1st Dep't Br. at 26-27.)  The first swab contained the DNA of one man, from which OCME developed a complete DNA profile designated "Male Donor A."  (State Br. at 23.)  Johnson's DNA profile matched the Male Donor A profile on all twenty-six alleles.  (State Br. at 23; Pearson 1st Dep't Br. at 27.)  This complete DNA profile could be expected to occur in one out of greater than one trillion African American people.  (State Br. at 23; Pearson 1st Dep't Br. at 28.)

The second swab contained DNA samples of two men, from which OCME extracted one man's sample and developed a partial DNA profile designated "Male Donor B."  (State Br. at 23; Pearson 1st Dep't Br. at 27.)  The mixture of two DNA samples in the second swab, however, prevented OCME from conclusively determining values for eight of the twenty-six alleles in the Male Donor B profile.  (State Br. at 23; Pearson 1st Dep't Br. at 27-28.)  Pearson's DNA profile matched the Male Donor B profile on all eighteen available alleles.  (State Br. at 23; Pearson 1st Dep't Br. at 28.)  This partial DNA profile could be expected to occur in one out of 270 million African American people.  (State Br. at 23; Pearson 1st Dep't Br. at 28.)[7]

**Verdict And Sentence**

On May 6, 2008, the jury convicted Pearson of eight counts of predatory sexual assault, one count of second degree kidnapping, four counts of first degree rape, two counts of first degree criminal sexual act, and one count of fifth degree criminal possession of stolen property.

---

[7]   Although Pearson's counsel retained a DNA expert in advance of trial, and on April 14, 2008 requested an adjournment of the trial to a date when that expert would be available, defense counsel ultimately did not call a DNA expert at trial.  (Maerov Aff. Ex. B: Gaffney § 440 Opp. Aff. ¶ 4; see also State Br. at 48.)

(Dkt. No. 14-1: State Br. at 3, 23; Dkt. No. 14: Maerov Aff. Ex. H: Pearson 1st Dep't Br. at 30.)  On

May 28, 2008, Pearson was sentenced to an aggregate prison term of 175 years to life.  (State Br.

at 1, 23-24; Pearson 1st Dep't Br. at 31.)

**Pearson's Post-Conviction Subpoena To OCME And The Prosecution's Motion To Quash**

Approximately a year before trial, pursuant to C.P.L. § 240.20(1)(c), the prosecutor

gave Pearson's defense counsel all three of the OCME files later admitted into evidence at trial.

(Dkt. No. 14-1: State Br. at 47-48; Dkt. No. 14: Maerov Aff. Ex. B: Gaffney § 440 Opp. Aff. ¶ 4.)

These files contained "written reports concerning the DNA analysis performed by OCME, printouts

of electronic data created by the OCME in connection with all of the evidence upon which the DNA

testing was performed, as well as printouts of the results of all such testing," and "all the notes and

notations of the analysts that pertain to the testing and the resulting conclusions."  (Gaffney § 440

Opp. Aff. ¶ 4.)  Pearson's trial counsel retained a DNA expert to review the OCME files.  (Gaffney

§ 440 Opp. Aff. ¶ 4.)  Before trial, Pearson's counsel never requested any additional material, and

chose not to call a DNA expert as a defense witness at trial.  (Gaffney § 440 Opp. Aff. ¶ 4.)

After trial, Pearson's appellate counsel requested copies of the three OCME files,

which the prosecution provided.  (Gaffney § 440 Opp. Aff. ¶ 4.)  Appellate counsel also requested

the "electronic raw data" relied on by OCME.  (Gaffney § 440 Opp. Aff. ¶ 4.)  According to OCME,

the requested data did not exist in any written form, and it would take four to six weeks to prepare

the data.  (Gaffney § 440 Opp. Aff. ¶ 4.)  On or about February 26, 2009, appellate counsel moved

ex parte for a subpoena duces tecum to OCME for this electronic raw data.  (Gaffney § 440 Opp.

Aff. ¶ 4; State Br. at 48.)  OCME informed the prosecutor, who moved to quash.  (Gaffney § 440

Opp. Aff. ¶ 4; State Br. at 48.)

On June 25, 2009, Justice Stone granted the prosecution's motion to quash. (Gaffney

§ 440 Opp. Aff. ¶ 4 & Ex. A: 6/25/09 Stone Dec. & Order.)  Justice Stone recounted the evidence

adduced during trial relevant to the requested electronic DNA data, and characterized Pearson's

contentions in favor of obtaining the evidence as follows:

> At the outset, this Court notes that there is no Federal constitutional
> requirement on the state to afford a defendant post-judgment DNA testing.  See
> District Attorney['s] Office v. Osborne, [557 U.S. 52, 129 S. Ct. 2308] (2009).  Thus,
> this case must be decided on New York law.  Pearson[] seeks this material under
> CPLR Article 610[], maintaining that there "may be substantial problems with . . .
> the method [the forensic biologist] used to deduce the partial minor DNA swab; and
> the statistical analysis performed on the partial profile."  Pearson contends the trial
> exhibits, which he obtained from the People to prepare for this motion, consist
> "largely of printouts made from the data files but not the computer files themselves,"
> and that as a result, the conviction may be based on "unreliable DNA evidence."
> Pearson wishes [to] obtain the laboratory testing protocols and the original data
> created during the DNA testing in order to give them to an expert to possibly render
> a scientific opinion about the reliability of the testing performed in this case.

(6/25/09 Stone Dec. & Order at 4-5.)

Justice Stone quashed Pearson's subpoena, holding:

> Pearson has failed to proffer a "good faith factual predicate sufficient for a
> court to draw an inference that the specifically identified materials are likely to be
> relevant and exculpatory."  His claim that the "material is reasonably likely to
> contain relevant information," and that such information is needed "in anticipation
> of filing a motion to vacate Mr. Pearson's conviction because it was obtained in
> violation of due process of law and [his] right to effective assistance of counsel" is
> an insufficient basis for a subpoena which requires "putting forth in good faith . . .
> some factual predicate which would make it reasonably likely that the file will bear
> such fruit and that the quest for its contents is not merely a desperate grasping at a
> straw." . . . Information which might potentially provide exculpatory material or
> which might possibly provide a basis for an ineffective assistance of counsel claim,
> is not a basis for the issuance of a subpoena.
>
> This Court finds Pearson's request not only a "fishing expedition" but also
> untimely.  Pearson was not only aware prior to trial of the existence of these files but
> was provided with the printouts from the original electronic data during discovery.
> Pearson never requested these materials prior to trial and his decision to not obtain

the electronic records by subpoena or through discovery, or to reevaluate them prior to trial by his own DNA expert, was his chosen tactical strategy and for which the law does not provide a second bite, having previously had such opportunity before trial.

(6/25/09 Stone Dec. & Order at 5-7, citations omitted.)   Justice Stone also noted that Pearson's defense counsel's decision not to obtain the electronic data earlier and to challenge the DNA testing at trial was a reasonable tactical decision, not an oversight:

> DNA evidence of a full sample may provide compelling evidence for conviction as well as acquittal.  Here at trial, the People had not been able to get a full sample, and produced DNA evidence that was less than fully conclusive as to conviction, although it ruled out a basis for acquittal.  It was thus a reasonable tactical decision for the defendant's DNA expert who was available to testify at the trial and who had studied the results of OCME's tests not to be called to testify for the defense.

(6/25/09 Stone Dec. & Order at 7 n.3.)

**Pearson's Post-Conviction C.P.L. § 440 Motion To Vacate The Judgment Of Conviction And For The Production Of Raw Electronic DNA Data**

On September 15, 2009, Pearson moved to vacate his conviction pursuant to C.P.L. §§ 440.10(h) and 440.30(1-a) on the grounds that it was obtained in violation of his constitutional rights, in that the introduction of "unreliable" DNA evidence violated his right to due process, or in the alternative, for an order compelling OCME to provide the "electronic raw data" associated with the DNA testing done on his case.  (Dkt. No. 14: Maerov Aff. Ex. A: 9/15/09 Pearson § 440 Motion Papers; Maerov Aff. Ex. B: Gaffney § 440 Opp. Aff. ¶¶ 2, 4; Maerov Aff. Ex. D: 12/17/09 Stone Dec. at 2; Dkt. No. 14-1: State Br. at 24.)[8]

---

[8]   C.P.L. § 440.10(1)(h) allows the court to vacate a judgment where it "was obtained in violation of a right of the defendant under the constitution of this state or of the United States."  C.P.L. § 440.30(1-a) provides, in relevant part:

(continued...)

Pearson's motion was supported by an affidavit from a new DNA expert, hired by Pearson's appellate counsel, who claimed that the prosecution's DNA evidence admitted at trial was erroneous and unreliable.  (Maerov Aff. Ex. A: Mazur § 440 Aff.  ¶¶ 34-37 & Ex. F: Krane Aff.; State Br. at 24, 49.)  Although Pearson's motion purported to rely on C.P.L. § 440.30(1-a), the provision allowing for new DNA testing in limited circumstances, Pearson's motion papers made clear that he did not actually seek any new DNA testing; rather, he sought the same "raw electronic data" which had been the subject of his previously quashed subpoena.  (See Mazur § 440 Aff. ¶¶ 41 & n.13, 45; State Br. at 49-50.)

Justice Stone denied Pearson's motion on the following bases:

> Pearson's claims must be denied on procedural grounds.  He was in possession of all the DNA files long before the trial and retained an expert to review the files and had the opportunity at trial to clarify matters through cross-examination or by calling his own expert, which he did not.  Pearson did not object to the introduction of the People's witness or the introduction of the DNA evidence.  As Pearson's "new" expert bases his opinion on the trial record and exhibits, he could have, but did not, place such objection on the record before sentencing.  Pearson's motion is denied on this ground.

> Likewise, Pearson has failed to substantiate that his "due process" rights were violated.  He was represented by counsel, retained a DNA expert, cross-examined the People's expert at trial and attacked the DNA evidence in his summation.  His retention of a new expert who cites "problems" with the People's expert, and who has

---

[8/]      (...continued)

> (a)(1) Where the defendant's motion requests the performance of a forensic DNA test on specified evidence, and upon the court's determination that any evidence containing deoxyribonucleic acid ("DNA") was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant.

not been subject to cross-examination by the People, does not, under CPL § 440.10(h), create a due process violation.

Even if this Court were to consider Pearson's claims as "newly discovered evidence," pursuant to CPL § 440.10(g),[9/] Pearson's claim fails. Pearson cannot prevail under this section as this evidence was discoverable before trial by exercise of due diligence and there is no probability based upon this Court's review, of a different result at trial even if a defendant has found "new evidence." Furthermore, Pearson has failed to satisfy the requirement that this evidence is "new," as the DNA evidence was provided to him many months before trial and was aware of what samples were taken from the victim and which tests and controls were used. Pearson chose not to request an independent laboratory test and was aware of the conclusions of the People's expert before trial. Furthermore, the non-DNA evidence which was introduced at trial, which included the victim's identification of Pearson and his possession of her keys and jewelry, overwhelmingly proved Pearson's identity as one of the perpetrators.

(12/17/09 Stone Dec. at 3-4, citations omitted, fn. added.)

Justice Stone relied on his prior order granting the prosecution's motion to quash Pearson's subpoena to support its denial of Pearson's alternative relief "for the Court to order disclosure of the electronic raw DNA data so that the 'newly retained expert' can re-analyze the DNA evidence." (12/17/09 Stone Dec. at 4.)

The First Department denied leave to appeal from Justice Stone's decision. (State Br. at 26; Maerov Aff. Ex. G: 3/4/10 1st Dep't Cert. Denying Leave.)

---

[9/]    C.P.L. § 440.10(1)(g) allows the court to vacate a judgment where:

New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence . . . .

**Pearson's Direct Appeal**

On June 25, 2010, Pearson filed his direct appeal, arguing in relevant part that: (1) his warrantless arrest violated <u>Payton</u> v. <u>New York</u>, 445 U.S. 573, 100 S. Ct. 1371 (1980), and physical evidence and statements obtained at the time of arrest therefore should have been suppressed; (2) the trial court improperly admitted three out-of-court statements in violation of the rule against hearsay and Pearson's right to confront witnesses against him; and (3) the denial of Pearson's C.P.L. § 440 motion as to the DNA evidence violated the Criminal Procedure Law and due process.  (Dkt. No. 14: Maerov Aff. Ex. H: Pearson 1st Dep't Br. at 3; <u>see also</u> <u>id.</u> at 36-86.)

The First Department unanimously affirmed Pearson's conviction and upheld the denial of Pearson's discovery application.  <u>People</u> v. <u>Pearson</u>, 82 A.D.3d 475, 918 N.Y.S.2d 409 (1st Dep't 2011).  As to Pearson's <u>Payton</u> argument, the First Department held:

> The court properly denied defendant's suppression motion.  There is no basis for disturbing the court's credibility determinations.  The stolen keys and jewelry recovered from defendant, as well as his statements pertaining thereto, were not the product of a warrantless entry into his apartment.  The location of defendant's arrest is dispositive of his claim under <u>Payton</u> v. <u>New York</u>, 445 U.S. 573, 100 S. Ct. 1371 . . . [1980].  The evidence supports the hearing court's finding that a detective (possessing undisputed probable cause to arrest) intercepted defendant at the threshold of his apartment and stopped him from entering, after which the detective arrested and searched defendant in the hallway.  Accordingly, defendant is not entitled to suppression of any evidence.  In any event, any error in receipt of this evidence was harmless in light of the overwhelming evidence of guilt, which included virtually conclusive DNA evidence as well as the victim's identification testimony.

<u>People</u> v. <u>Pearson</u>, 82 A.D. 3d at 475, 918 N.Y.S.2d at 411 (citations omitted).

The First Department also rejected Pearson's hearsay and confrontation clause arguments, finding:

Defendant did not preserve his hearsay and Confrontation Clause arguments regarding other police testimony, and we decline to review them in the interest of justice. As an alternative holding, we also reject them on the merits. In each instance, the evidence was neither testimonial within the meaning of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 . . . [2004] nor was it offered for its truth. In any event, we similarly find that any error was harmless.

People v. Pearson, 82 A.D.3d at 475-76, 918 N.Y.S.2d at 411.[10/]

Finally, with respect to Pearson's due process argument based on the DNA evidence which had been the subject of Pearson's C.P.L. § 440 motion, the First Department held:

This Court previously denied defendant's motion for leave to appeal from that portion of the December 2009 order that denied defendant's motion to vacate the judgment. The balance of this order is appealable only if it denied a motion for DNA testing under CPL 440.30(1-a). However, defendant's purported CPL 440.30(1-a) motion was actually a request for post-conviction discovery of electronic DNA data, and not a motion for "the performance of a forensic DNA test on specified evidence." Accordingly, there is no statutory basis for defendant's appeal. In any event, we note that defendant obtained the services of a DNA expert before trial and had a full opportunity to challenge the People's DNA results.

People v. Pearson, 82 A.D.3d at 476, 918 N.Y.S.2d at 412 (citations omitted).

On July 29, 2011, the New York Court of Appeals denied leave to appeal. People v. Pearson, 17 N.Y.3d 809, 929 N.Y.S.2d 568 (2011).

**Pearson's Federal Habeas Corpus Petition**

In April 2012, Pearson filed his pro se federal habeas corpus petition arguing that:

(1) his warrantless arrest in his home violated Payton v. New York, 445 U.S. 573, 100 S. Ct. 1371

---

[10/]     The First Department found one hearsay claim preserved, but that claim is not raised in the instant habeas petition. (State Br. at 38 n.11; see also Pet. at 7.) As to that one preserved claim, the First Department held: "To the extent that, in testifying about the chain of custody for the stolen property, a detective implicitly related declarations made by another detective, who also testified, we find any error to be harmless." People v. Pearson, 82 A.D.3d at 475, 918 N.Y.S.2d at 411.

(1980), and statements and physical evidence obtained at the time of arrest should have been suppressed (Dkt. No. 1: Pet. ¶ 13(1)); (2) the trial court improperly admitted hearsay testimony in violation of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004) (Pet. ¶ 13(2)); and (3) denial of Pearson's post-conviction § 440 motion seeking discovery of electronic DNA data violated his due process rights (Pet. ¶ 13(3)).

## ANALYSIS

## I.   THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners."  Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000).  The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[11/]

---

[11/]   See also, e.g., Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011); Knowles v. Mirzayance, (continued...)

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 404-05, 120 S. Ct. at 1519.[12/]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 412, 120 S. Ct. at 1523.[13/]  The relevant Supreme Court

---

[11/]  (...continued)
556 U.S. 111, 121, 129 S. Ct. 1411, 1418 (2009); <u>Portalatin</u> v. <u>Graham</u>, 624 F.3d 69, 78-79 (2d Cir. 2010) (en banc), <u>cert. denied</u>, 131 S. Ct. 1691, 1693 (2011); <u>Henry</u> v. <u>Poole</u>, 409 F.3d 48, 67 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1040, 126 S. Ct. 1622 (2006); <u>Howard</u> v. <u>Walker</u>, 406 F.3d 114, 121-22 (2d Cir. 2005); <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d 193, 197 (2d Cir. 2004); <u>Dallio</u> v. <u>Spitzer</u>, 343 F.3d 553, 559-60 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 961, 124 S. Ct. 1713 (2004); <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'" (quoting <u>Lainfiesta</u> v. <u>Artuz</u>, 253 F.3d 151, 155 (2d Cir. 2001), <u>cert. denied</u>, 535 U.S. 1019, 122 S. Ct. 1611 (2002))).

[12/]  <u>Accord</u>, <u>e.g.</u>, <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Jones</u> v. <u>Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000); <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d 113, 125 (2d Cir. 2000), <u>cert. denied</u>, 532 U.S. 943, 121 S. Ct. 1404 (2001); <u>Clark</u> v. <u>Stinson</u>, 214 F.3d 315, 320 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[13/]  <u>Accord</u>, <u>e.g.</u>, <u>Carey</u> v. <u>Musladin</u>, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court regarding [this issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. 652, 661, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); <u>Portalatin</u> v. <u>Graham</u>, 624 F.3d at 79 ("To qualify as 'clearly established' for the purposes of federal habeas review, a rule of law must be embodied in the 'holdings, as opposed to the dicta,' of Supreme Court precedent."); <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d 145, 153-54 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d 160, 164 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 642 (2009); <u>Hargett</u> v. <u>Giambruno</u>, 291 F. App'x 402, 403 (2d Cir. 2008); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d 587, 591 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1047, 124 S. Ct. 2171 (2004); <u>Yung</u> v. <u>Walker</u>, 341 F.3d 104, 109-10 (2d Cir. 2003); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181; <u>DelValle</u> v.
(continued...)

jurisprudence is that in effect at the time of the state court's adjudication on the merits (in New York, usually the decision of the Appellate Division), not at the time of a subsequent decision (e.g., the New York Court of Appeals) denying leave to appeal.  Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011).

"That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied, 555 U.S. 1176, 129 S. Ct. 1312 (2009).  "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .  A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[14]

---

[13]    (...continued)
Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

[14]    Accord, e.g., Knowles v. Mirzayance, 556 U.S. at 122, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly
(continued...)

In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams v. Taylor, 529 U.S. at 413, 120 S. Ct. at 1523.[15/]  However, "[t]he term 'unreasonable' is . . . difficult to define."  Williams v. Taylor, 529 U.S. at 410, 120 S. Ct. at 1522.  The Supreme Court made clear that "an unreasonable application of federal law is different from an incorrect application of federal law."  Id.[16/]  Rather, the issue is "whether the state court's

---

[14/]     (...continued)
established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court." (quotation omitted)); Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 538 U.S. at 73-74, 123 S. Ct. at 1173-74; Portalatin v. Graham, 624 F.3d at 79; Bierenbaum v. Graham, 607 F.3d 36, 47-48 (2d Cir. 2010), cert. denied, 131 S. Ct. 1693 (2011); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009), cert. denied, 131 S. Ct. 320 (2010); Dunlap v. Burge, 583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; DelValle v. Armstrong, 306 F.3d at 1200; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

[15/]     Accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1399; Waddington v. Sarausad, 555 U.S. 179, 190, 129 S. Ct. 823, 831 (2009); Brown v. Payton, 544 U.S. at 141, 125 S. Ct. at 1439; Wiggins v. Smith, 539 U.S. at 520, 123 S. Ct. at 2534-35; Bierenbaum v. Graham, 607 F.3d at 48; Brisco v. Ercole, 565 F.3d 80, 87 (2d Cir.), cert. denied, 130 S. Ct. 739 (2009); Jones v. West, 555 F.3d 90, 96 (2d Cir. 2009); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006), cert. denied, 549 U.S. 1257, 127 S. Ct. 1383 (2007); Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d at 181.

[16/]     See also, e.g., Renico v. Lett, 130 S. Ct. 1855, 1862 (2010); Waddington v. Sarausad, 555 U.S. at 190, 129 S. Ct. at 831; Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ
(continued...)

application of clearly established federal law was objectively unreasonable." Williams v. Taylor,

529 U.S. at 409, 120 S. Ct. at 1521.[17/]  "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  This is a

"'substantially higher threshold'" than incorrectness.  Renico v. Lett, 130 S. Ct. at 1862; accord, e.g.,

Knowles v. Mirzayance, 556 U.S. at 123, 129 S. Ct. at 1420.[18/]  Federal habeas relief is precluded

---

[16/]    (...continued)
simply because that court concludes in its independent judgment that the state-court decision
applied [a Supreme Court case] incorrectly.'" (quoting Woodford v. Visciotti, 537 U.S. 19,
24-25, 123 S. Ct. 357, 360 (2002))); Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175;
Dunlap v. Burge, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the
relevant federal law should have been interpreted differently than the way it was interpreted
by the state court yet still conclude that the state court's application of the federal law was
not unreasonable."); Brisco v. Ercole, 565 F.3d at 87-88; Jones v. West, 555 F.3d at 96;
Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443
F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v.
McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at
124-25; DelValle v. Armstrong, 306 F.3d at 1200 ("With regard to issues of law, therefore,
if the state court's decision was not an unreasonable application of, or contrary to, clearly
established federal law as defined by Section 2254(d), we may not grant habeas relief even
if in our judgment its application was erroneous.").

[17/]    Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v.
Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct.
at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti,
537 U.S. at 25-27, 123 S. Ct. at 360-61; Portalatin v. Graham, 624 F.3d at 79; Dunlap v.
Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515,
519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Hawkins v. Costello,
460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard
v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d
at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184;
Lurie v. Wittner, 228 F.3d at 128-29.

[18/]    However, the Second Circuit has explained "that while '[s]ome increment of incorrectness
beyond error is required . . . the increment need not be great; otherwise, habeas relief would
be limited to state court decisions so far off the mark as to suggest judicial incompetence.'"

(continued...)

"so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

Harrington v. Richter, 131 S. Ct. 770, 786 (2011).   "This is a 'difficult to meet' and 'highly

deferential standard for evaluating state-court rulings.'"   Cullen v. Pinholster, 131 S. Ct. at 1398

(citations omitted); accord, e.g., Greene v. Fisher, 132 S. Ct. at 43; Santone v. Fischer, 689 F.3d 138,

147 (2d Cir. 2012), cert. denied, No. 12-5949, 2012 WL 3651031 (Oct. 1, 2012).

"[T]he range of reasonable judgment can depend in part on the nature of the relevant

rule." Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149.[19/]   "Even if the state court issued

---

[18/]        (...continued)
        Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.
        2000)); accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown
        v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the 'unreasonable
        application' standard 'falls somewhere between merely erroneous and unreasonable to all
        reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246;
        Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396
        F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Yung v. Walker, 341 F.3d at 110;
        Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Loliscio v. Goord, 263
        F.3d at 184.

[19/]     The Supreme Court explained:

                [T]he range of reasonable judgment can depend in part on the nature of the relevant
                rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule
                may be plainly correct or incorrect.  Other rules are more general, and their meaning
                must emerge in application over the course of time.  Applying a general standard to
                a specific case can demand a substantial element of judgment.  As a result,
                evaluating whether a rule application was unreasonable requires considering the
                rule's specificity.  The more general the rule, the more leeway courts have in
                reaching outcomes in case-by-case determinations.

        Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149; accord, e.g., Harrington v.
        Richter, 131 S. Ct. at 786; Renico v. Lett, 130 S. Ct. at 1864; Knowles v. Mirzayance, 556
        U.S. at 123, 129 S. Ct. at 1420 (Where the Supreme Court "standard is a general standard,
        a state court has even more latitude to reasonably determine that a defendant has not satisfied
        that standard."); Portalatin v. Graham, 624 F.3d at 79; Ortiz v. N.Y.S. Parole in Bronx, N.Y.,
                                                                                        (continued...)

a decision 'contrary to' clearly established Supreme Court law, a petitioner 'cannot obtain relief . . . unless application of a <u>correct</u> interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" <u>Cousin</u> v. <u>Bennett</u>, 511 F.3d 334, 339 (2d Cir.), <u>cert. denied</u>, 553 U.S. 1096, 128 S. Ct. 2910 (2008) (citation omitted).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 45.[20/]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1398; <u>Felkner</u> v. <u>Jackson</u>, 131 S. Ct. 1305, 1307 (2011) (per curiam) ("On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" (citations omitted)); <u>Renico</u> v. <u>Lett</u>, 130 S. Ct. at 1862; <u>Bell</u> v. <u>Cone</u>, 543 U.S. at 455, 125 S. Ct. at 853;

---

[19/]    (...continued)
586 F.3d at 157; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 166; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243.

[20/]    <u>Accord</u>, <u>e.g.</u>, <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 47-48; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140-41; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d at 591; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>see</u> <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision.  There is force to this argument.  Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  At the same time, the difference between applying a rule and extending it is not always clear.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." (citations omitted)).

<u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d at 519.  "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to th[e] record in an unreasonable manner." <u>Acosta</u> v. <u>Artuz</u>, 575 F.3d 177, 184 (2d Cir. 2009); <u>accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1398 ("The petitioner carries the burden of proof."); <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d at 154.  As the Supreme Court explained:

> If this standard is difficult to meet, that is because it was meant to be. . . . [§ 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decisions conflict with [the Supreme] Court's precedents.  It goes no further. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Harrington</u> v. <u>Richter</u>, 131 S. Ct. at 786-87.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies.

> [D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.  And as this Court has observed, a state court need not cite or even be aware of [Supreme Court] cases under § 2254(d).  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.

<u>Harrington</u> v. <u>Richter</u>, 131 S. Ct. at 784 (citations to <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d at 312, & other cases omitted); <u>accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1402; <u>Bell</u> v. <u>Cone</u>, 543 U.S. at 455, 125 S. Ct. at 853; <u>Early</u> v. <u>Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (state court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them"); <u>Wilson</u> v.

Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'").[21/] "'[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" Cullen v. Pinholster, 131 S. Ct. at 1402.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 131 S. Ct. at 784-85.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S. Ct. at 1398; accord, e.g., Greene v. Fisher, 132 S. Ct. at 44.

---

[21/] See also, e.g., Wade v. Herbert, 391 F.3d 135, 140, 142 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "[i]f any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference.").

Finally, in appropriate circumstances, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48; Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48 ("A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."); Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II.  PEARSON'S FOURTH AMENDMENT CLAIMS ARE NOT COGNIZABLE ON HABEAS REVIEW

Pearson claims that his arrest violated his Fourth Amendment rights under Payton v. New York, 445 U.S. 573, 100 S. Ct. 1371 (1980), and that his statements and the physical evidence found on his person at the time of his arrest should therefore have been suppressed. (Dkt. No. 1: Pet. ¶ 13(1).)

Pearson's Fourth Amendment claims must be assessed by reference to the Supreme Court's decision in Stone v. Powell, 428 U.S. 465, 96 S. Ct. 3037 (1976), which precludes habeas review of Fourth Amendment claims that have been litigated in state court:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief

on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.  In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force.

Stone v. Powell, 428 U.S. at 494-95, 96 S. Ct. at 3052-53 (fns. omitted).[22]

The Second Circuit, sitting en banc, has concluded that Stone v. Powell permits

federal habeas review of exclusionary rule contentions only in limited circumstances:

If the state provides no corrective procedures at all to redress Fourth Amendment violations, federal habeas corpus remains available.  It may further be that even where the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process, the federal intrusion may still be warranted.

Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (citations omitted), cert. denied, 434 U.S.

1038, 98 S. Ct. 775 (1978).[23]

---

[22]  Accord, e.g., Wallace v. Kato, 549 U.S. 384, 395 n.5, 127 S. Ct. 1091, 1099 n.5 (2007); Withrow v. Williams, 507 U.S. 680, 682-86, 113 S. Ct. 1745, 1748-50 (1993); McCleskey v. Zant, 499 U.S. 467, 479, 111 S. Ct. 1454, 1462 (1991); Palacios v. Burge, 589 F.3d 556, 561 (2d Cir. 2009), cert. denied, 131 S. Ct. 267 (2010); Singh v. Miller, 104 F. App'x 770, 772 (2d Cir.), cert. denied, 543 U.S. 1026, 125 S. Ct. 668 (2004); Gandarilla v. Artuz, 322 F.3d 182, 185 (2d Cir. 2003); Graham v. Costello, 299 F.3d 129, 133-34 (2d Cir. 2002); Fowler v. Kelly, No. 95-2527, 104 F.3d 350 (table), 1996 WL 521454 at *3 (2d Cir. Sept. 16, 1996); Capellan v. Riley, 975 F.2d 67, 69-71 (2d Cir. 1992); Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991); Plunkett v. Johnson, 828 F.2d 954, 956 (2d Cir. 1987).

[23]  Accord, e.g., Young v. Conway, No. 11-830-pr, --- F.3d ----, 2012 WL 4876235 at *13 (2d Cir. Oct. 16, 2012); Munford v. Graham, 467 F. App'x 18, 19 (2d Cir. 2012); Singh v. Miller, 104 F. App'x at 772; Gandarilla v. Artuz, 322 F.3d at 185; Graham v. Costello, 299 F.3d at 133-34; Branch v. McClellan, No. 96-2954, 234 F.3d 1261 (table), 2000 WL 1720934 at *3 (2d Cir. Nov. 17, 2000); Capellan v. Riley, 975 F.2d at 70; Aziz v. Warden of Clinton Corr. Facility, 92 Civ. 104, 1992 WL 249888 at *3 (S.D.N.Y. Sept. 23, 1992), aff'd, 993 F.2d 1533 (2d Cir.), cert. denied, 510 U.S. 888, 114 S. Ct. 241 (1993); Allah v. LeFevre, 623 F. Supp. 987, 990-92 (S.D.N.Y. 1985); see also, e.g., Grayson v. Artus, No. 08-CV-0493, 2010 WL 446035 at *6 (E.D.N.Y. Feb. 1, 2010); Poole v. New York, 08 Civ. 6236, 2009 WL 3009356 at *6 (S.D.N.Y. Sept. 21, 2009); Kirk v. Burge, 646 F. Supp. 2d 534, 545 (S.D.N.Y. 2009);
(continued...)

Here, Pearson litigated his Fourth Amendment claims at the pretrial suppression hearing and on direct appeal to the First Department.  (See pages 3-7, 18-19 above.)  Thus, state corrective process not only was available, but was employed for Pearson's Fourth Amendment claims.  See, e.g., Munford v. Graham, 467 F. App'x at 19 (where Fourth Amendment claim was raised at suppression hearing and on direct appeal to the First Department, "[t]here is no basis to hold that [petitioner's] Fourth Amendment rights were not adequately protected"); Singh v. Miller, 104 F. App'x at 772 (petitioner had "ample opportunity to vindicate his Fourth Amendment rights in the state courts" when, inter alia, he "raised his Fourth Amendment argument on appeal" to the Second Department); Gandarilla v. Artuz, 322 F.3d at 185 ("[T]he merits of a Fourth Amendment challenge are not reviewable in a federal habeas proceeding if a defendant has had a fair opportunity to litigate that question in State court . . . ."); Graham v. Costello, 299 F.3d at 134 ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the [state] court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief."); Blagrove v. Mantello, No. 95-2821, 104 F.3d 350 (table), 1996 WL 537921 at *2 (2d Cir. Sept. 24, 1996) (where petitioner's "Fourth Amendment issues were raised before the trial court in

---

23/        (...continued)
Pena v. New York, 04 Civ. 9499, 2008 WL 4067339 at *9 (S.D.N.Y. Aug. 26, 2008); Smith v. Senkowski, No. 97 CV 1280, 1999 WL 138903 at *6 (E.D.N.Y. Mar. 10, 1999) (Petitioner claimed he was arrested without probable cause and that his pretrial statements therefore should have been suppressed.  "A federal court is not permitted to judge the merits of the state court's decision. The Court need only find that the State's procedure for resolving Fourth Amendment claims is 'facially adequate' and that no unconscionable breakdown' of the process occurred in the petitioner's case.  An unconscionable breakdown occurs when the state court fails to conduct a reasoned inquiry into the petitioner's claim." (citing Capellan v. Riley, 975 F.2d at 71)).

the suppression hearing and before the Appellate Division in [his] pro se brief" petitioner's "Fourth

Amendment argument is barred [from federal habeas review] because the issue was fully and fairly

litigated in the state courts"); Capellan v. Riley, 975 F.2d at 70 & n.1 ("[T]he 'federal courts have

approved New York's procedure for litigating Fourth Amendment claims . . . .'"); McPhail v.

Warden, Attica Corr. Facility, 707 F.2d 67, 69 (2d Cir. 1983) (New York's procedure for litigating

a Fourth Amendment claim in a criminal trial complied with requirement that state provide an

opportunity to litigate such claims).[24]

       This rule applies to Payton claims as well as other Fourth Amendment claims.

McPhail v. Warden, Attica Corr. Facility, 707 F.2d at 69-70; see also, e.g., Cameron v. Smith, No.

11 Civ. 5100, 2011 WL 6708790 at *2 (E.D.N.Y. Dec. 21, 2011) ("Courts have repeatedly

---

[24]     See also, e.g., Singh v. Miller, 104 F. App'x at 772 ("We have held that the focus of the inquiry as to whether there has been an 'unconscionable breakdown' in the state corrective process is on 'the existence and application of the corrective procedures themselves' rather than on the 'outcome resulting from the application of adequate state court corrective procedures.' [Petitioner] does not and cannot contend that New York does not provide corrective procedures for violations of Fourth Amendment rights." (citation omitted)); Montero v. Sabourin, 02 Civ. 8666, 2003 WL 21012072 at *5 (S.D.N.Y. May 5, 2003) ("[H]abeas review of Fourth Amendment claims that were, or could have been, previously litigated in state court are barred by Stone v. Powell. . . . It has long been acknowledged that New York provides adequate procedures under C.P.L. § 710 et seq., for litigating Fourth Amendment claims."); Ferron v. Goord, 255 F. Supp. 2d 127, 130-31 (W.D.N.Y. 2003) ("The Second Circuit has noted that Stone requires only that 'the state have provided the opportunity to the state prisoner for full and fair litigation of the Fourth Amendment claim.'" (quoting Gates v. Henderson, 568 F.2d at 839)); Baker v. Bennett, 235 F. Supp. 2d 298, 307 (S.D.N.Y. 2002) ("The state court need only grant a petitioner 'an opportunity for full and fair litigation of a fourth amendment claim.'" (quoting Capellan v. Riley, 975 F.2d at 70)); Fayton v. Goord, 01 Civ. 2912, 2001 WL 694573 at *1 (S.D.N.Y. June 18, 2001) ("Since this petition is based on a fully and fairly litigated Fourth Amendment claim . . . such relief cannot be granted."); Gumbs v. Kelly, 97 Civ. 8755, 2000 WL 1172350 at *10 (S.D.N.Y. Aug. 18, 2000) (Peck, M.J.) (New York's procedure for litigating Fourth Amendment claims provides full and fair opportunity to litigate claim).

recognized that New York provides an adequate corrective procedure for Fourth Amendment claims. Thus, district courts within the Circuit have almost uniformly declined to hear <u>Payton</u> claim[s] on habeas review." (citations omitted)); <u>Benton</u> v. <u>Brown</u>, 537 F. Supp. 2d 584, 591 (S.D.N.Y. 2008) ("Petitioner took full advantage of this opportunity to litigate these issues when he challenged the legality of his arrest at a <u>Huntley</u>/<u>Dunaway</u>/<u>Payton</u> hearing. . . .  Petitioner thus received an opportunity for full and fair litigation of his Fourth Amendment claim in state court, and he is now barred from further review of this claim in this habeas corpus proceeding."); <u>Daily</u> v. <u>New York</u>, 388 F. Supp. 2d 238, 245-50 (S.D.N.Y. 2005) (where suppression hearing was held and the state "court found that there was no <u>Payton</u> violation," petitioner's habeas claim was not cognizable since petitioner "was given a full and fair opportunity to litigate his Fourth Amendment claims"); <u>Long</u> v. <u>Donnelly</u>, 335 F. Supp. 2d 450, 455, 458 (S.D.N.Y. 2004) (petitioner's claim that evidence "he possessed at the time of his arrest should have been suppressed due to the <u>Payton</u> violation" was not cognizable on habeas review where petitioner "utilized the facially-valid state procedural mechanism to its maximum possible extent").

Because Pearson cannot claim a complete absence of corrective process, habeas review of his Fourth Amendment claim is only available if he demonstrates an "unconscionable breakdown" in the state's procedure for litigating those issues.  The Second Circuit has held that the focus of the unconscionable breakdown inquiry lies in "'the existence and application of the corrective procedures themselves'" rather than on the "'outcome resulting from the application of adequate state court corrective procedures.'" <u>Singh</u> v. <u>Miller</u>, 104 F. App'x at 772 (quoting <u>Capellan</u> v. <u>Riley</u>, 975 F.2d at 71).  Pearson does not claim any "unconscionable breakdown" in the State's procedure here, nor could he.  <u>See generally</u> <u>Calderon</u> v. <u>Perez</u>, 10 Civ. 2562, 2011 WL 293709 at

*32-33 (S.D.N.Y. Jan. 28, 2011) (Peck, M.J.) (discussing when an "unconscionable breakdown does and does not occur," citing cases), report & rec. adopted, 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011).

For these reasons, Pearson's Fourth Amendment habeas claim should be denied as uncognizable on habeas review.

## III.   PEARSON'S CLAIM THAT THE TRIAL COURT ADMITTED HEARSAY TESTIMONY INTO EVIDENCE IN VIOLATION OF HIS SIXTH AMENDMENT CONFRONTATION CLAUSE RIGHTS IS WITHOUT MERIT

Pearson claims certain police testimony was admitted into evidence in violation of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), and his Sixth Amendment right to confront witnesses, because the evidence was hearsay and should have been excluded.  (Dkt. No. 1: Pet. ¶ 13(2).)  On direct appeal, the First Department rejected Pearson's claims procedurally and on the merits: "Defendant did not preserve his hearsay and Confrontation Clause arguments regarding other police testimony, and we decline to review them in the interest of justice.  As an alternative holding, we also reject them on the merits." People v. Pearson, 82 A.D.3d 475, 475, 918 N.Y.S.2d 409, 411 (1st Dep't), appeal denied, 17 N.Y.3d 809, 929 N.Y.S.2d 568 (2011).

Because Pearson's trial counsel did object to the two areas of testimony challenged as hearsay (see pages 9-11 nn.4-5 above), and because the claim is in any event without merit, the Court will not address the State's argument (Dkt. No. 14-1: State Br. at 37-41) that this claim is barred by the adequate and independent state ground doctrine.  See generally Robinson v. Smith, 09 Civ. 8222, 2011 WL 1849093 at *23-26 (S.D.N.Y. May 17, 2011) (Peck, M.J.) (citing cases), report & rec. adopted, 2011 WL 3163466 (S.D.N.Y. July 26, 2011).

Pearson's habeas petition challenges two colloquies as constituting hearsay violations: Detective Ruiz's testimony about his interview of Kenneth Johnson (see pages 9-10 n.4 above), and Detective Torres' testimony that he "found out" that the keys found on Pearson at the time of his arrest did not belong to his sister, as Pearson had claimed (see page 11 n.5 above).  (Dkt. No. 1: Pet. ¶ 13(2).)

As to Detective Ruiz's testimony, the trial judge sustained Pearson's counsel's objections, granted his motion to strike testimony, and instructed Det. Ruiz to "just tell us what you did," and Det. Ruiz responded that the police looked for Pearson and Johnson.  (See pages 9-10 n.4 above.)  Thus, no hearsay testimony was admitted into evidence.  To the extent that Pearson argued to the First Department that this testimony bolstered DC's identification of Pearson (see Dkt. No. 14: Maerov Aff. Ex. H: Pearson 1st Dep't Br. at 61), the rule against bolstering is one of state law and does not provide a basis for habeas relief.  See, e.g., Fernandez v. Artus, 07 Civ. 2532, 2009 WL 1586271 at *15 (S.D.N.Y. June 8, 2009) (Peck, M.J.) (& cases cited therein); King v. Greiner, 02 Civ. 5810, 2008 WL 4410109 at *34 (S.D.N.Y. Sept. 26, 2008) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2009 WL 2001439 (S.D.N.Y. July 8, 2009), aff'd, 453 F. App'x 88 (2d Cir. 2011); Rivera v. Ercole, 07 Civ. 3577, 2007 WL 2706274 at *20 (S.D.N.Y. Sept. 18, 2007) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2008 WL 627507 (S.D.N.Y. Mar. 7, 2008). Moreover, case law is clear that it is permissible for the police to testify that after they interviewed a witness, they took certain steps in their investigation.  See, e.g., Moore v. Ercole, No. 09-CV-1003, 2012 WL 407084 at *8 (E.D.N.Y. Feb. 8, 2012) (detective's testimony that as a result of interviews they targeted the defendant was admissible "to provide context for or explain a police investigation"); Matos v. Ercole, 08 Civ. 8814, 2010 WL 2720001 at *8 (S.D.N.Y. June 28, 2010)

(detective's testimony that he received a picture of the defendant from defendant's brother and then generated a wanted poster "was properly admitted to complete the narrative" explaining why detectives began pursuing petitioner); Newland v. Lape, 05 Civ. 2686, 2008 WL 2485404 at *2, *5 (S.D.N.Y. June 19, 2008) ("[S]tatements admitted merely to complete a narrative or explain the actions of a police officer are admissible."); People v. Tosca, 98 N.Y.2d 660, 661, 746 N.Y.S.2d 276, 276 (2002) ("The [police officer's] testimony was admitted not for its truth, but to provide background information as to how and why the police pursued and confronted defendant."); People v. Rivera, 96 N.Y.2d 749, 751, 725 N.Y.S.2d 264, 265 (2001) ("[T]he trial court did not abuse its discretion in admitting the testimony for the limited purpose of explaining the officer's actions."). Thus, Det. Ruiz's testimony did not violate Pearson's confrontation rights, and in any event the First Department's holding to that effect is not contrary to or an unreasonable application of Supreme Court precedent.

Detective Torres' testimony that he "found out that the keys" found on Pearson did not belong to Pearson's sister, as Pearson claimed, may not even be hearsay, but even if it is, its admission was harmless. DC herself testified at trial that the keys found on Pearson were her keys. (Dkt. No. 16: DC: Tr. 190-91.) Thus, again, at most Det. Torres' testimony was bolstering, and harmless in light of DC's identification of the keys as hers, DC's strong identification of Pearson as one of the rapists, and the DNA evidence. See, e.g., Hardison v. Artus, 06 Civ. 0322, 2006 WL 1330064 at *12 (S.D.N.Y. May 16, 2006) (Peck, M.J.) ("[E]ven if the prosecutor's comments could be construed as improper, the comments, as the First Department held, were harmless error. The evidence of [petitioner's] guilt was overwhelming – not only did [the victim] identify him in court but the male DNA found on [the victim] matched [petitioner's], with the likelihood of someone else

matching the DNA being one in one trillion." (citations omitted)), report & rec. adopted, 2006 WL 1763678 (S.D.N.Y. June 23, 2006); Ellis v. Phillips, 04 Civ. 7988, 2005 WL 1637826 at *25 (S.D.N.Y. July 13, 2005) (Peck, M.J.) (any error in admitting challenged evidence was harmless in light of "weighty" evidence of guilt including DNA and victim's identification of petitioner in and out of court); Robinson v. Mazzuca, 01 Civ. 0001, 2002 WL 31246535 at *6 (S.D.N.Y. Oct. 7, 2002) (any error in admitting challenged testimony "was harmless in light of other trial evidence connecting [petitioner] to the crime" including "that [the victim's] stolen property was recovered on the floor of the parking garage, at or near the area where [petitioner] was apprehended").  The First Department's decision that any error in admitting this testimony was harmless was not contrary to or an unreasonable application of Supreme Court precedent.

Accordingly, Pearson's hearsay/confrontation clause claim (Pet. ¶ 13(2)) does not provide a basis for habeas relief.

## IV.  PEARSON'S DNA-RELATED DUE PROCESS CLAIMS SHOULD BE DENIED

The third ground advanced by Pearson in his habeas petition alleges that the denial of his post-conviction efforts to obtain "raw electronic DNA" data violated his due process rights. (Dkt. No. 1: Pet. ¶ 13(3).)  Specifically, Pearson claims that:

> 9.  Petitioner's substantive rights to post conviction relief under state law and the state's DNA post conviction relief procedures are fundamentally inadequate to vindicate said rights.  Petitioner utilized his only option available when petitioning the state court for relief under CPL 440.10/440.30.

> 10.  Petitioner does understand that a due process right to evidence does not exist under the federal constitution for DNA testing, however Petitioner contends that testing is not what he seeks, rather Petitioner simply sought access to electronic DNA data of tests results of evidence already conducted.  Certainly Petitioner has a right to access the results of these tests as such could have well raised reasonable doubts in the minds of ju[r]ors as to Petitioner's guilt on all of the charges convicted of.

(Pet. ¶ 13(3).)  Pearson acknowledges that the discovery he seeks – "access to electronic DNA data

of tests results of evidence already conducted" (Pet. ¶ 13(3); see also Dkt. No. 14: Maerov Aff. Ex.

H: Pearson 1st Dep't Br. at 67; Maerov Aff. Ex. A: Mazur § 440 Aff. ¶ 45: "Pearson's request for

forensic DNA testing does not include any additional testing of physical evidence but is limited to

analysis of the raw electronic data generated during the DNA testing already conducted by the

prosecution.") – falls outside the scope of New York's C.P.L. § 440 post-judgment relief provisions,

but argues that the state's failure to provide a procedural mechanism by which he could obtain the

electronic DNA data violates his due process rights.[25]

       This argument is contrary to the well-established rule that there is no federal

constitutional right to post-conviction collateral relief, including discovery and specifically DNA

testing, and therefore such claims are not cognizable on habeas review.  See, e.g., Murray v.

Giarratano, 492 U.S. 1, 10, 109 S. Ct. 2765, 2771 (1989) ("State collateral proceedings are not

constitutionally required as an adjunct to the state criminal proceedings . . . ."); Newton v. City of

N.Y., 784 F. Supp. 2d 470, 476 (S.D.N.Y. 2011) ("[P]risoners who 'seek [] evidence for their state

court post-conviction actions' are only entitled to those due process rights recognized by the state

legislature." (quoting McKithen v. Brown, 626 F.3d 143, 153 (2d Cir. 2010))); Wesley v. Alexander,

---

[25]    Pearson also appears to claim that his due process rights were violated at trial when an
OCME analyst "committed perjury by testifying that additional (excu[l]patory evidence) Y-
STR testing had not been performed when in fact it had" and where "[t]he prosecution knew
or should have known of the false testimony provided by it's own witnesses and that
testimony was material."  (Dkt. No. 1: Pet. ¶ 13(3).)  Pearson failed to raise this claim, i.e.,
a due process violation based on allegedly perjurious testimony, in either his post-conviction
motion or on his subsequent direct appeal.  (See pages 15-19 above.)  The claim therefore
is unexhausted and deemed exhausted and procedurally barred.  For full analysis of the
exhaustion doctrine see, e.g., Shaw v. Wendlend, 11 Civ. 4852, 2012 WL 29357 at *9-10
(S.D.N.Y. Jan. 6, 2012) (Peck, M.J.) (& cases cited therein).

No. 10-CV-245, 2010 WL 2710609 at *7 (E.D.N.Y. July 7, 2010) (Petitioner "challenges the state court's denial of his request for DNA and fingerprint analysis.  Habeas relief is a vehicle for defendants to challenge the validity of their conviction and sentence. [Petitioner's] claim, if granted, would not 'necessarily demonstrate[] the invalidity of the conviction,' but rather may present a ground upon which to do so.  Accordingly, this is not a cognizable basis for federal habeas relief." (citations omitted)); Charriez v. Greiner, 265 F.R.D. 70, 88 (E.D.N.Y. 2010) ("The Supreme Court has held there is no right of postconviction access to biological evidence for DNA testing.  In the absence of such a right, defendant's claim states no basis for federal habeas relief." (citing District Attorney's Office v. Osborne, 557 U.S. 52, 54-71, 129 S. Ct. 2308, 2312-23 (2009)); Green v. Walsh, 03 Civ. 0908, 2006 WL 2389306 at *20 (S.D.N.Y. Aug. 17, 2006) ("Petitioner may be attempting to challenge the state court's refusal to order that the semen sample be re-tested.  To the extent any such claim would be based on a New York statutory right, it would not be cognizable in this federal habeas proceeding.  Further, to the extent Petitioner is claiming that the state court deprived him of his right to due process by denying his Section 440.30 motion without a hearing, Petitioner cannot actually demonstrate the violation of a constitutional right.  There is no constitutional provision that even requires a state to grant post-conviction review, and, therefore, most federal courts have rejected due process claims arising out of the conduct of state courts in post-conviction proceedings, holding that such claims are also not cognizable on habeas review." (citations omitted)); People v. Sterling, 6 Misc. 3d 712, 721-23, 787 N.Y.S.2d 846, 853-54 (Sup. Ct. Monroe Co. 2004) ("Addressing first defendant's due process argument, it is well-settled that there is no constitutional right to discovery.  Discovery in a criminal proceeding is governed entirely by

statute. . . .  If the legislators intended CPL § 440.30(1-a) to be a general discovery statute, they could have simply stated such."), aff'd, 37 A.D.3d 1158, 827 N.Y.S.2d 920 (4th Dep't 2007).[26/]

        Petitioner attempts to state a cognizable habeas claim by alleging that the state court's denial of his post-conviction motion was "an unreasonable application of" District Attorney's Office v. Osborne, 557 U.S. 52, 129 S. Ct. 2308 (2009) (Pet. ¶ 13(3)), which addressed whether Alaska's post-conviction statutory DNA testing procedure satisfied due process requirements.  See District Attorney's Office v. Osborne, 557 U.S. at 69, 129 S. Ct. at 2320 ("[T]he question is whether consideration of Osborne's claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'").  This argument is belied by Pearson's admission that the relief he seeks here, like the relief he sought at the state court level, falls outside the scope of New York's post-conviction statutory DNA testing procedure, namely, "that testing is not what he seeks, rather [Pearson] simply sought access to electronic DNA data of test[] results of evidence already conducted." (Pet. ¶ 13(3);

---

[26/]    See also, e.g., Pennsylvania v. Finley, 481 U.S. 551, 556-77, 107 S. Ct. 1990, 1994 (1987); Word v. Lord, 648 F.3d 129, 131-32 (2d Cir. 2011) ("As the Supreme Court has recognized, the Constitution does not compel states to provide post-conviction proceedings for relief. . . . [A]lleged errors in a post-conviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief."); Cruz v. Smith, 05 Civ. 10703, 2010 WL 582348 at *29 (S.D.N.Y. Feb. 17, 2010) ("As no constitutional provision requires a state to grant post-conviction review, most federal courts have rejected due process claims arising out of the conduct of state post-conviction proceedings, holding that such claims are not cognizable on habeas review." (citation omitted)); Jones v. Duncan, 162 F. Supp. 2d 204, 219 (S.D.N.Y. 2001) (Peck, M.J.) (procedural defects in post-conviction proceedings are not cognizable on federal habeas review).

see also Maerov Aff. Ex. H: Pearson 1st Dep't Br. at 67; Maerov Aff. Ex. A: Mazur § 440 Aff. ¶ 45:

"Pearson's request for forensic DNA testing does not include any additional testing of physical

evidence but is limited to analysis of the raw electronic data generated during the DNA testing

already conducted by the prosecution.")[27/]

       Finally, even if Pearson were properly challenging C.P.L. § 440.30(1-a)'s

constitutionality under District Attorney's Office v. Osborne, 557 U.S. 52, 129 S. Ct. 2308 (2009)

– which, as stated above, he is not – the claim still would be unavailing, since the Second Circuit

already has upheld the constitutionality of C.P.L. § 440.30(1-a) under Osborne.  See McKithen v.

Brown, 626 F.3d at 152 ("After Osborne, it is clear the process afforded by section 440.30(1-a)(a)

is constitutionally adequate."); Newton v. City of N.Y., 784 F. Supp. 2d at 477 ("In McKithen, the

Second Circuit expressly held that New York's post-conviction DNA statute is not 'fundamentally

inadequate to vindicate [a prisoner's] residual liberty interest in demonstrating his innocence through

---

[27/]    Even if Pearson's argument were read as one seeking retesting of the previously tested DNA evidence – which, admittedly, it does not (Pet. ¶ 13(3)) – that, too, is outside the scope of New York's post-conviction statutory DNA testing procedure.  E.g., People v. Holman, 63 A.D.3d 1088, 1088, 880 N.Y.S.2d 559, 559 (2d Dep't) ("Moreover, the court properly determined that CPL 440.30(1-a) does not provide for retesting of DNA material."), appeal denied, 13 N.Y.3d 860, 891 N.Y.S.2d 694 (2009); People v. Jones, 307 A.D.2d 721, 722, 761 N.Y.S.2d 928, 929 (4th Dep't) ("Because CPL 440.30(1-a) does not provide for retesting for DNA material, the court properly denied the motion."), appeal denied, 1 N.Y.3d 574, 775 N.Y.S.2d 791 (2003); see also People v. Kellar, 218 A.D.2d 406, 409-10, 640 N.Y.S.2d 908, 910 (3d Dep't) ("As a final matter, even if we concluded that DNA testing may have affected the outcome of the trial, we would affirm County Court's order on the basis of our prior determination that the presence of sperm and the possibility of DNA testing was fully known to defendant and its use explored by him with his counsel in advance of trial . . . .  We do not read CPL 440.30(1-a) as granting a second opportunity to those who have failed to take advantage of available DNA testing prior to trial." (citations omitted)), appeal denied, 88 N.Y.2d 937, 647 N.Y.S.2d 171 (1996).

a state post-conviction proceeding.' Applying the deferential <u>Medina</u> standard of review as dictated

by <u>Osborne</u>, the <u>McKithen</u> court held that subsection 440.30(1-a)(a) satisfies due process, even if

read in a way that allows courts the discretion to reject a prisoner's requests for DNA testing."

(quoting <u>McKithen</u> v. <u>Brown</u>, 626 F.3d at 145)); <u>Figueroa</u> v. <u>Morgenthau</u>, 09 Civ. 4188, 2009 WL

3852467 at *2 (S.D.N.Y. Nov. 18, 2009) (Petitioner "has not shown the New York state post-

conviction relief procedure to be inadequate.  On its face, the New York statute is more permissive

in allowing access to evidence for DNA testing than the Alaskan procedures that the Court found

constitutional in <u>Osborne</u>. . . . If the Alaskan post-conviction relief procedures pass constitutional

muster, then the more permissive New York procedures certainly do.  Moreover, [plaintiff] has not

identified any way in which the state procedures were applied in violation of his constitutional

rights." (citations omitted)).[28]

---

[28]    <u>See also</u>, <u>e.g.</u>, <u>Wesley</u> v. <u>Alexander</u>, 2010 WL 2710609 at *7 ("Moreover, even if reviewed
on its merits, [Petitioner's] claim must fail.  The Supreme Court has held that defendants do
not have a due process right to post-conviction DNA testing.  Rather, a prisoner seeking
post-conviction DNA testing must demonstrate that the state's post-conviction procedures
'are fundamentally inadequate to vindicate the substantive rights provided.'  In <u>Osborne</u>, the
Supreme Court upheld Alaska's post-conviction statute, which allowed 'access to
evidence . . . for those who seek to subject it to newly available DNA testing that will prove
them to be actually innocent.'  The New York statute allows for DNA testing when 'there
exists a reasonable probability that the verdict would have been more favorable to the
defendant.'  It was pursuant to this statute that the state court denied his request for relief.
The New York statute requires a less onerous showing to obtain access to the evidence than
the statute at issue in <u>Osborne</u>.  As a result, the state court's decision cannot have been
contrary to or an unreasonable application of clearly established federal law as determined
by the Supreme Court." (citing <u>District Attorney's Office</u> v. <u>Osborne</u>)); <u>Charriez</u> v. <u>Greiner</u>,
265 F.R.D. at 88 ("Even if such a right were recognized, the state courts' refusal to allow
DNA testing would not warrant federal habeas relief. . . . To the extent defendant seeks to
challenge the state court's denial of his request for testing under applicable New York law,
the [] challenge is outside the scope of federal habeas review.  Federal habeas relief does not
lie for mere errors of state law."); <u>Shenouda</u> v. <u>Breslin</u>, No. 03 CV 5767, 2004 WL 1918805
at *5-6 (E.D.N.Y. Aug. 27, 2004) (Petitioner "claims that the state courts wrongly declined
(continued...)

## CONCLUSION

For the reasons set forth above, Pearson's habeas corpus petition should be <u>DENIED</u> in its entirety and a certificate of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6.[29] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Alison J. Nathan, 500 Pearl Street, Room 615, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Nathan (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human</u>

---

[28]     (...continued)
to order DNA testing of the three syringes. . . . To the extent [petitioner] claims a violation of a right conferred by New York statute, his claim is not cognizable on habeas review."); <u>McDonald</u> v. <u>Smith</u>, Nos. 02-CV-6743, 03-MISC-0066, 2003 WL 22284131 at *8, 10 (E.D.N.Y. Aug. 21, 2003), <u>aff'd</u>, 134 F. App'x 466 (2d Cir. 2005).

[29]     If the pro se petitioner requires copies of any of the cases reported only in Westlaw, petitioner should request copies from the government's counsel. <u>See</u> <u>Lebron</u> v. <u>Sanders</u>, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

44

Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:        New York, New York
              October 23, 2012

                                        Respectfully submitted,

                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge

Copies to:    Reginald Pearson (Mail)
              Michelle E. Maerov, Esq. (ECF)
              Judge Alison J. Nathan